# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 00-1529/1642

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | Appeals from the United States |
| | * | District Court for the District of |
| Randy Anderson; and James Anderson, | * | Minnesota. |
| Also Known as "Bodine," | * | |
| | * | |
| Appellants. | * | |

_____

Submitted:  November 13, 2000

Filed:  February 22, 2001

_____

Before MORRIS SHEPPARD ARNOLD and JOHN R. GIBSON, Circuit Judges, and
 GOLDBERG,[1] Judge.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

James Anderson was convicted of conspiring to distribute cocaine and cocaine base (crack), *see* 21 U.S.C. § 841(a)(1), § 846, and of being a felon in possession of a firearm, *see* 18 U.S.C. § 922(g)(1).  One of his coconspirators, Randy Anderson (no relation), pleaded guilty to conspiring to distribute cocaine and cocaine base.  James

_____

[1]The Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

Anderson appeals his convictions, contending that an invalid search warrant was used to obtain evidence and that the district court erred by admitting hearsay testimony. Randy Anderson appeals his sentence, contending that the district court incorrectly calculated the amount of drugs attributable to him and erroneously used unrelated conduct to increase his sentence. We affirm the district court.

I.

We address James Anderson's appeal first. During a search of Mr. Anderson's apartment, police found a pistol, cocaine, and a common cutting agent for cocaine. Mr. Anderson maintains that this evidence should have been suppressed because the search warrant pursuant to which it was obtained was supported by an affidavit that intentionally misquoted a telephone conversation involving Mr. Anderson. The affiant misquoted a statement by Mr. Anderson that he would "put him up" in his home as "put it up," and indicated his belief that this statement meant that Mr. Anderson would be keeping drugs at his home. The district court concluded that, without the misquotation in the affidavit, probable cause would not have existed to issue the warrant, but the court nevertheless refused to grant Mr. Anderson a hearing on the question of whether the misquotation in the affidavit required suppression of the evidence.

Mr. Anderson would have been entitled to such a hearing if he had made "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause," *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). We review the district court's refusal to grant a "*Franks* hearing" for an abuse of discretion. *See United States v. Milton*, 153 F.3d 891, 897 (8th Cir. 1998), *cert. denied*, 525 U.S. 1165 (1999).

In his petition for a *Franks* hearing, Mr. Anderson contended that the agent's actions were either intentional or reckless, and relied on the fact that the affidavit in support of the warrant contained a misquotation. Mr. Anderson provided no evidence,

-2-

however, to support his conclusory contention, and without it he cannot meet his burden under *Franks*, because "[a] mere allegation standing alone, without an offer of proof in the form of a sworn affidavit of a witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing," *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998), *cert. denied*, 525 U.S. 1089, 1165 (1999). We see nothing in the misquotation itself, which is not in any way egregious, to support an inference of reckless or intentional fabrication. Because Mr. Anderson failed to make a substantial preliminary showing of intentional or reckless behavior, the district court did not err in refusing to grant a *Franks* hearing.

## II.

James Anderson's second contention is that the district court erred by allowing certain testimony by Officer Bart Hauge, who was a principal in the investigation of Mr. Anderson. In particular, Mr. Anderson complains of Officer Hauge's testimony that Mr. Anderson was the "enforcer" of the conspiracy as well as the officer's testimony as to the meaning of wiretapped phone conversations involving Mr. Anderson and his coconspirators. Because Mr. Anderson did not object to this testimony at trial, we review for plain error. *See United States v. Campa-Fabela*, 210 F.3d 837, 840 (8th Cir. 2000), *petition for cert. filed* (September 27, 2000).

Mr. Anderson maintains that Officer Hauge's testimony contained inadmissible hearsay evidence. Officer Hauge testified in some detail as to what he learned about the case during his investigation, which primarily consisted of his listening to several thousand wiretapped phone calls (some of which were played to the jury) between the various members of the conspiracy. During his testimony, Officer Hauge frequently referred to statements made on the tapes by Mr. Anderson and his coconspirators. Mr. Anderson contends that these references constituted inadmissible hearsay and that Officer Hauge's use of hearsay testimony confused the jury, because it was unclear when he was testifying to facts rather than simply to his own opinions. We find no error, much less plain error, in the admission of this testimony.

Officer Hauge's testimony as to statements made by Mr. Anderson himself is of course not hearsay because they are prior statements by a party-opponent. *See* Fed. R. Evid. 801(d)(2)(A). Officer Hauge also testified as to statements made by Mr. Anderson's coconspirators. Statements by a coconspirator are, under certain circumstances, admissible under Fed. R. Evid. 801(d)(2)(E). In determining whether such statements are admissible, a district court is first to allow the testimony conditionally, and then make findings on the record as to the existence of a conspiracy and whether the statements at issue were made in furtherance of it. *See United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir. 1978). In making this determination, a court is allowed to consider the statements themselves. *See United States v. Roulette*, 75 F.3d 418, 424 (8th Cir. 1996), *cert. denied*, 519 U.S. 853 (1996). While the district court did not follow (nor was it asked to follow) the *Bell* requirements in this case, Mr. Anderson suffered no prejudice, because the record indicates overwhelming evidence of the existence of a conspiracy and that the relevant statements were made in furtherance of it. *See id.* at 425.

Officer Hauge further testified to his opinions regarding Mr. Anderson's role in the offense and to the meaning of certain statements on the tapes that were heard by the jury. There was no plain error in the admission of this testimony. We have previously held that it is within a court's discretion to allow an officer to testify regarding a defendant's role in an offense. *See United States v. Scavo*, 593 F.2d 837, 843-44 (8th Cir. 1979). Officer Hauge's gloss on the tapes was similarly permissible, as law enforcement officials may testify "concerning the modus operandi of drug dealers and ... concerning activities which are 'not something with which most jurors are familiar,' " *United States v. White*, 890 F.2d 1012, 1014 (8th Cir. 1989), *cert. denied*, 497 U.S. 1010 (1990), quoting *Scavo*, 593 F.2d at 844. Officer Hauge's testimony was designed, in part, to instruct the jury on how the conversations that they heard were drug-related activities. The district court therefore did not plainly err in admitting this testimony, and thus we affirm James Anderson's conviction.

III.

We turn now to Randy Anderson's appeal from his sentence of 360 months for conspiring to distribute cocaine and cocaine base (crack). Paragraph 61 of Mr. Anderson's presentence report (PSR) concluded that he was responsible for at least 5.36 kilograms of cocaine and 1.91 kilograms of crack, a total evidently arrived at by adding up some of the drug quantities involved in more than 20 separate transactions that were discussed in other sections of the PSR. The district court found, after an extensive sentencing hearing, that sufficient evidence existed to support the inclusion of each of these transactions in the sentencing calculation, and thus to support the total contained in paragraph 61 of the PSR. Based on this finding, the district court determined that Mr. Anderson's base offense level was 38.

Mr. Anderson vigorously objects to the district court's computation, and, indeed, at oral argument the government admitted that paragraph 61 of the PSR contained an arithmetic error in its computation of the total amount of crack and thus that the district court's finding was in this respect incorrect. The government maintains, however, that even if all of Mr. Anderson's objections to the PSR's quantity computations were sustained, his sentencing range would not change, and that, since he was sentenced at the very bottom of that range, the sentence would have been the same and thus there was no error.

We have carefully examined each objection that Mr. Anderson made to the district court's calculation of the amount of drugs for which he is responsible for sentencing purposes, and we agree that not all of those calculations can be sustained. For instance, the district court found that Mr. Anderson should be held accountable for 520.7 grams of crack cocaine associated with an uncharged shooting incident that occurred in 1994. It is true that a police report stated that bags found at the scene of that incident contained 520.7 grams of "crack/cocaine," but a chemist who tested the substance reported that it was "powder cocaine with a total weight of 490.9 grams."

We think that it was clearly erroneous to find that the substance involved in these circumstances was crack, where the chemist said that it was powder cocaine and the police report merely said that it was "crack/cocaine," an equivocal statement at best. The officer who testified at the sentencing hearing, moreover, twice stated that the substance was powder cocaine. We also think that it was clearly erroneous to attribute to Mr. Anderson any amount of any drug that was involved in the 1994 incident, since the only evidence tying him to the drugs was the fact that they were found in a car that contained a briefcase with papers inside it that were somehow connected to him.

We also believe that the district court clearly erred in attributing another 57 grams of crack cocaine to Mr. Anderson. The only evidence presented with regard to this amount was the hearsay testimony of an officer who said that Lamar Ford, one of Mr. Anderson's coconspirators, sold 57 grams of crack to an unnamed confidential informant. Drugs dealt by a coconspirator pursuant to a conspiracy may be attributed to all conspirators, so long as the district court finds "by a preponderance of the evidence that the transaction or activity involving the drugs was in furtherance of the conspiracy and either known to that defendant or reasonably foreseeable to him." *United States v. Brown*, 148 F.3d 1003, 1008 (8th Cir. 1998). Here, however, the officer testified that he had "no idea where [Mr. Ford] obtained the crack cocaine," and we see nothing in the record to connect Mr. Anderson with these drugs.

We discern the same infirmity, moreover, in the government's proof concerning another 43 grams of crack for which the district court held Mr. Anderson responsible, evidently because it was seized at a coconspirator's house. That coconspirator, Edward Scott, according to the government's witness, said that the crack came from someone other than Mr. Anderson, and the same witness also seems to have admitted on cross-examination that this crack did not come from Mr. Anderson. Under the circumstances, we think that the district court clearly erred in attributing these drugs to Mr. Anderson.

Our careful examination of the record, however, reveals that sufficient evidence existed to uphold the district court's findings in most respects. In particular, we think that the government's proof supported a finding that Mr. Anderson was responsible for a total of 6,083 grams of cocaine and 983 grams of crack, or the equivalent of 20,876 kilograms of marijuana, *see* U.S.S.G. § 2D1.1, application note 10. Although this would result in a base offense level of 36, *see* U.S.S.G. § 2D1.1(c)(2), and not 38 as the district court held, we conclude that this error, for reasons that will shortly appear, was harmless.

Mr. Anderson also maintains that the district court erroneously enhanced his sentence by four levels because he was the leader of the conspiracy of which he was convicted, *see* U.S.S.G. § 3B1.1(a), and by another two levels because of the presence of a firearm during the offense, *see* U.S.S.G. § 2D1.1(b)(1). We find ample evidence in the record to support both of these enhancements. We therefore conclude that Mr. Anderson's total offense level, taking into account his three-level reduction for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, is 39. The sentencing guideline range for a defendant with an offense level of 39 and a criminal history level of V is 360 months to life, the same range within which Mr. Anderson was sentenced. We note, moreover, that Mr. Anderson was sentenced at the bottom of this range. The district court's errors in determining drug quantity thus did not affect Mr. Anderson's sentence.

IV.

Randy Anderson also contends that the district court erred when calculating his sentence by including drug quantities associated with events that occurred in 1994 and 1996, several years before the conspiracy to which he pleaded guilty. These events include a 1994 incident in which Mr. Anderson purchased several ounces of cocaine and crack from an undercover informant, a 1996 incident in which Mr. Anderson sold several ounces of crack to an Indiana undercover officer, and a separate 1996 incident

in Indiana in which Mr. Anderson was discovered in possession of more than a pound of crack.

Mr. Anderson contends first that these events are not "relevant conduct" for which he may be held responsible under U.S.S.G. § 1B1.3(a)(2), which includes in the sentencing calculus "all acts ... that were part of the same course of conduct or common scheme or plan as the offense of conviction." Under this guideline, a district court should consider the " 'similarity, regularity, and temporal proximity' of the conduct in determining whether it is part of the same course of conduct or common scheme or plan," *United States v. Chatman*, 982 F.2d 292, 294 (8th Cir. 1992), quoting *United States v. Hahn*, 960 F.2d 903, 910 (9th Cir. 1992).

We believe that the district court did not err in including the 1994 and 1996 events as relevant conduct. The testimony at the sentencing hearing indicated that Mr. Anderson was a longtime cocaine dealer, interrupted only by his occasional stays in prison. While these events were separated temporally from the charged conduct, there is evidence to show that Mr. Anderson was engaged in a career of drug dealing going back to at least 1994. The events in question were thus close to the charged conduct in both their similarity and their regularity. The evidence therefore supports a finding that these events were part of the same course of conduct as the charged conduct, and the district court was entitled to find that they constituted relevant conduct. *See United States v. Geralds*, 158 F.3d 977, 978-79 (8th Cir. 1998), *cert. denied*, 526 U.S. 1031 (1999).

Mr. Anderson also contends that the district court erred in refusing to apply a heightened standard of proof when determining his responsibility for these events. We have previously held that the preponderance standard "may fail to comport with due process where ... a sentence enhancement factor becomes 'a tail which wags the dog of the substantive offense,' " *United States v. Townley*, 929 F.2d 365, 369 (8th Cir. 1991), quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986). Such a situation

is rare, however, and we have previously approved the use of the preponderance standard for relevant conduct that increased the defendant's sentence fourfold. *See United States v. Alvarez*, 168 F.3d 1084, 1088 (8th Cir. 1999).

If we were to exclude the 1994 and 1996 events from the sentencing calculation, Mr. Anderson would have an offense level of 35 and a criminal history level of IV, and a corresponding sentencing range of 235 to 293 months. The increase in Randy Anderson's sentence to 360 months is not, we think under the standard enunciated in *McMillan*, so significant as to raise due process concerns that would require a heightened standard of proof. We therefore affirm his sentence.

V.

For the foregoing reasons, the judgments of the district court are affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.